UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| MICHAEL WELCH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 2:12-CV-10 (CEJ) |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On March 10, 2010, plaintiff Michael Welch filed an application for disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of February 15, 2010. (Tr. 114-20). After plaintiff's application was denied on initial consideration (Tr. 57), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 67).

Plaintiff and counsel appeared for a video hearing on May 4, 2011. (Tr. 21-52). The ALJ issued a decision denying plaintiff's application on September 7, 2011 (Tr. 6-20), and the Appeals Council denied plaintiff's request for review on January 4, 2012. (Tr. 1-3). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Disability Application Documents

In his Disability Report (Tr. 145-54), plaintiff listed his disabling conditions as injuries to his back and left knee, and herniated discs. Plaintiff reported that from

1989 to 2010 he was employed as a pipefitter in the construction industry. As a pipefitter, plaintiff's duties included climbing, frequently lifting 50 pounds or more, heavy rigging, industrial applications, and supervising others. Plaintiff wrote that he was unemployed, and stopped working on February 12, 2010 because of his conditions. He reported taking Hydrocodone for pain and Valium as a muscle relaxer.

In his Function Report (Tr. 156-166), plaintiff stated that he lives in a house with his family. On an average morning, he wakes up at 6:00 a.m., eats breakfast, gets the mail, and visits a friend or his parents. In the afternoon, his wife fixes lunch, and he does small tasks around the house and rests. He was able to mow the lawn using a riding lawn mower, but he couldn't push a mower or rake leaves. His wife did most of the housework and cared for their daughter who has spina bifida. In the evening, plaintiff stated that he eats dinner and watches television. He reported that in the past, he was able to cook most of the family's meals, hunt, fish, work on race cars, travel to watch car races, and walk for exercise. Because of his health conditions, he is no longer able to pursue these hobbies.

Plaintiff wrote that, when dressing himself, he cannot bend to put on socks, shoes, and pants. When bathing, he cannot bend to wash his feet or dry his legs. He stated that he goes outside a few times every day. He is able to drive, and goes shopping for groceries or clothes a few times per week. His social activities include visiting his parents once every week and playing cards, and going for pizza twice per month with friends. He reported difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and climbing stairs. He could walk a few blocks before needing to rest for about 10 minutes. He also reported that he follows instructions well and handles stress and changes in routine fairly well.

B. <u>Hearing on May 4, 2011</u>

Plaintiff was 45 years old at the time of the hearing, and lived with his wife and son. He had attended school through the tenth grade, and then went on to complete his GED. He also had formal vocational training for pipefitting. Plaintiff testified that he stopped working because of his back injury. Plaintiff stated that he had surgery in 2008, after his initial injury. After recovering and returning to work, he was injured again. He stated that the pain was too great to continue working, so he was terminated at his request. He received unemployment benefits until September of 2010, and filed a workers' compensation claim that was pending at the time of the hearing.

Plaintiff stated that he had problems with his cervical and lumbar spine, and his left knee on which he had ACL reconstruction in 2000. He also stated that he suffers from carpal tunnel syndrome in both arms. He testified that he has difficulty standing, walking, sitting, lifting, and carrying. He also stated that he was born with lazy eye, has had three eye surgeries, and has limited vision in his right eye.

Plaintiff confirmed that he was taking Enalapril and Metoprolol for high blood pressure, Oxycontin and Hydrocodone for pain, Valium as a muscle relaxer, and Omeprazole for acid reflux. He also told the ALJ that he had recently been diagnosed with depression and that he was taking Cymbalta for depression in addition to his other medications. He stated that side effects of his medications occur frequently, and include racing thoughts, crying, and difficulty concentrating. Plaintiff reported that he was unable to concentrate long enough to read an entire newspaper article.

Plaintiff described the pain in his lower back as constant and as a sharp to aching pain, the pain in both legs as constant but varying between sharp, dull, and burning, the pain in his neck as sharp and steady, and the pain in his upper back as a dull ache. Plaintiff also reported being able to walk 1 to 2 hours per day, stand still

for 20 or 30 minutes 2 or 3 times per day, sit in a chair with a straight back for about an hour, and lift a gallon of milk only if he held it close to his body.  Plaintiff said that he had no problems driving.  On a typical day, plaintiff has to lie down 4 or 5 times for about 30 to 45 minutes.  Plaintiff stated that he plans to have spinal fusion surgery, but cannot afford to do so until his workers' compensation claim is resolved.  (Tr. 21-47).

Thomas Upton, Ph.D., testified as a vocational expert. (Tr. 106).  The ALJ asked Dr. Upton about employment opportunities for a hypothetical individual with plaintiff's education and age, with the ability to perform sedentary work, frequently balance, kneel, crouch, and crawl, and occasionally climb and stoop.  Dr. Upton stated that such an individual would be able to work as a telephone quotation clerk (84,700 employees in the national economy), a hand packer (22,000 employees in the national economy), or a weight tester for production inspection (13,300 employees in the national economy).  The ALJ then posed a second hypothetical, and asked if any jobs would be available for the plaintiff if plaintiff's testimony was found to be totally credible and supported by the evidence. Dr. Upton responded that he not believe any jobs would exist.  (Tr. 47-51).

### C. Medical Evidence

On May 19, 2008, plaintiff visited a neurosurgeon, William F. Hoffman, M.D., F.A.C.S.  Dr. Hoffman observed that a straight leg raise on the right was positive at 30 to 40 degrees, and on the left at 30 degrees.[1]  Dr. Hoffman noted that plaintiff had

---

[1] A straight leg raise test is conducted by having the patient lie on his back, and the doctor raising one leg upward with the knee straight.  If the patient experiences pain on the back of the leg below the knee, the test is positive (abnormal).  A positive result may be indicative of a herniated disc. WebMD, http://www.webmd.com/a-to-z-guides/straight-leg-test-for-evaluating-low-back-pain-topic-overview (last visited January 16, 2013).

an MRI scan revealing degenerative changes in the lower lumbar discs at L4-5 and L5-S1. On the left side at L3-4 there was a lateral disc bulge, but Dr. Hoffman identified the "main problem" as a large disc bulge at L4-5 causing moderate to moderate severe spinal stenosis.[2] (Tr. 246-47).

On September 2, 2008, plaintiff underwent surgery. Dr. Hoffman performed a microdissection, far lateral discectomy, and disc fragment removal at L3-4, and a discectomy at L4-5. Postoperative diagnoses included far lateral herniated disc at L3-4 left with intractable back and leg pain, and a large herniated disc at L4-5 central and right.[3] (Tr. 249-50).

About one year later, on September 23, 2009, plaintiff met with Gill C. Wright, III, M.D. Plaintiff reported that he was injured at work on September 14, and was experiencing pain across his low back and hip. Dr. Wright diagnosed plaintiff with lumbar radiculopathy.[4] Based on the radiation of plaintiff's pain, Dr. Wright concluded that there was L5 nerve root irritation. Dr. Wright ordered an MRI. (Tr. 221-22).

Plaintiff underwent an MRI of his lumbar spine on September 25, 2009. The MRI revealed: multilevel degenerative disc, end plate and facet changes throughout the lumbar spine, probable right hemilaminectomy defect at L3-4 and definite

---

[2] Spinal stenosis is defined as "the narrowing of spaces in the spine (backbone) which causes pressure on the spinal cord and/or nerves. About 75% of cases of spinal stenosis occur in the low back (lumbar spine). In most cases, the narrowing of the spine associated with stenosis compresses the nerve root, which can cause pain along the back of the leg." WebMD, http://www.webmd.com/back-pain/guide/spinal-stenosis (last visited Jan. 16, 2013).

[3] Disk herniation is the "extension of disk material… into the spinal canal." Stedman's Medical Dictionary (27th Ed.) at 814. A discectomy is the removal of the herniated disc material. See UCLA Spine Center, http://spinecenter.ucla.edu/body.cfm?id=151 (last visited Jan. 18, 2013).

[4] Radiculopathy is a "disorder of the spinal nerve roots." Stedman's Medical Dictionary (27th Ed.) at 1503. Lumbar radiculopathy usually occurs when a herniated disc pinches a nerve root. UCLA Spine Center, http://spinecenter.ucla.edu/body.cfm?id=128 (last visited Jan. 18, 2013).

hemilaminectomy defect at L4-5. The MRI also suggested multilevel degenerative changes resulting in moderate to severe neural foraminal crowding. (Tr. 208-09).

On September 29, 2009, plaintiff returned to Dr. Wright. Dr. Wright concluded that plaintiff suffered from radiculopathy at L5. Based on the MRI, Dr. Wright concluded this condition was caused by pre-existing lumbar disease, and was not directly work-related. Dr. Wright recommended that plaintiff return to regular work. (Tr. 215-216).

On February 15, 2010, the alleged onset date, plaintiff returned to the neurosurgeon, Dr. Hoffman. Dr. Hoffman's notes state that, after being released to return to work by Dr. Wright, plaintiff experienced increasing pain in his left leg. Plaintiff had been taking high doses of Aleve and ibuprofen to cope with the pain. Dr. Hoffman stated that plaintiff had a moderate restricted range of motion with only 15 degree forward flexion without pain. Straight leg raising was negative on the right, and positive on the left at 45 degrees. Dr. Hoffman referred plaintiff to pain management. (Tr. 243).

On March 22, 2010, plaintiff met with Gregory Stynowick, M.D. for pain management. Dr. Stynowick diagnosed plaintiff with left L5 and S1 radiculitis, L4-5 and L5-S1 herniated nucleus pulposus,[5] lumbar facet anthropathy, and trapezius and lumbar paraspinous muscle spasms, and myofascial pain. Dr. Stynowick prescribed Norco, Valium, and steroid injections. (Tr. 296). On March 29, 2010, plaintiff had another MRI. (Tr. 271-72). Plaintiff began receiving steroid injections from Dr. Stynowick in April 2010. (Tr. 268, Tr. 328).

---

[5] Herniated nucleus pulposus is another name for a herniated disc. See Medline Plus, http://www.nlm.nih.gov/medlineplus/herniateddisk.html (last visited Jan. 18, 2012).

On April 26, 2010, Michael Ditmore, M.D., acting as an agency medical consultant, completed a physical RFC assessment based on plaintiff's documented degenerative disc disease and previous herniated disc. Dr. Ditmore found that plaintiff can lift 20 pounds occasionally, 10 pounds frequently, stand or walk for 6 hours in an 8 hour workday, sit for 6 hours in an 8 hour workday, and push or pull in an unlimited manner. Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, frequently balance, occasionally stoop, and frequently kneel, crouch, and crawl. (Tr. 277-82).

In May 2010, plaintiff continued to receive injections from Dr. Stynowick. (Tr. 324; 323). On May 24, 2010, plaintiff visited Daniel Mattson, M.D., a neurosurgeon, at the St. Louis Neurological Institute. Dr. Mattson found that plaintiff had multifactorial pain, lumbar and cervical radiculopathy, and "demonstrable weakness on exam." Dr. Mattson suspected plaintiff's mid-back pain was musculoskeletal, and started plaintiff on a membrane stabilizer, Titrate Gabapentin. (Tr. 338).

On June 1, 2010, Dr. Stynowick completed a physical RFC questionnaire. Dr. Stynowick listed plaintiff's symptoms as back, leg, and shoulder pain. Dr. Stynowick categorized plaintiff's pain as a 6 on a pain-scale of 10, which would increase with prolonged standing and walking. Diagnoses were listed as cervical and lumbar radiculitis and spinal stenosis. Dr. Stynowick completed only the first page of the RFC questionnaire, and wrote that he does not do functional capacity evaluations. (Tr. 286-290).

On June 28, 2010, plaintiff returned to Dr. Hoffman and stated that the injections from Dr. Stynowick had not helped. Dr. Hoffman found restriction of motion in plaintiff's neck, and numbness in his left leg, right thigh, and right arm. Dr. Hoffman reviewed the most recent MRI, which revealed spondylosis in the cervical

spine at C4-5 with moderate bilateral foraminal narrowing impinging on the C5 nerve roots,[6] and left facet osteoarthritis at C5-6 possibly impinging on the C6 nerve root. In plaintiff's low back, the MRI revealed postoperative changes at L4-5 with possible additional nerve root compression by recurrent or persistent herniated disc or by scar. (Tr. 292).

On June 30, 2010, an eletrophysologic test was performed on plaintiff who complained of numbness and tingling in his fingers. Results were normal. (Tr. 297). On the same day, plaintiff also had a myelogram[7] of his back which showed mild anterior subluxation of L4 on L5, ventral defects at L3-4 and L4-5, a wide ventral epidural space at L5-S1, nerve root compression at L4-5, and mild effacement of the nerve root at L3-4. (Tr. 284).

On July 12, 2010, plaintiff saw Dr. Hoffman and discussed the possibilities of surgical fusion and decompression. (Tr. 291) On August 31, 2010, plaintiff briefly visited Dr. Stynowick to refill prescriptions. Dr. Stynowick's notes reflect that plaintiff stated the medications provide moderate relief throughout the day but not at night. (Tr. 314). On September 28, 2010, plaintiff returned to Dr. Stynowick to refill prescriptions and discontinue certain medications that were not providing relief. (Tr. 313). Plaintiff again visited Dr. Stynowick on October 26, 2010; the doctor's notes reflect that plaintiff stated OxyCotin was providing improved pain relief. (Tr. 312). Plaintiff returned to Dr. Stynowick on February 9, 2011 for pain management (Tr. 348), and on February 17, 2011 received another steroid injection. (Tr. 346). On

---

[6] "Cervical spondylosis is caused by chronic wear on the cervical spine" and can lead to pressure on the nerve roots. Medline Plus, http://www.nlm.nih.gov/medlineplus/ency/article/000436.htm (last visited Jan. 18, 2012).

[7] A myelogram uses dyes injected into the intrathecal space to examine the spinal cord. Tabler's Cyclopedic Medical Dictionary (14th Ed.) at 923.

April 27, 2011, Dr. Stynowick's notes reflect plaintiff complained of pain and depression. (Tr. 351).

On June 14, 2011, orthopedic surgeon Gregory Henry, D.O., completed a consultative examination and medical source assessment, and concluded that plaintiff is able to lift and carry up to 10 pounds, sit for 1 hour at a time and 4 hours total in an 8-hour workday, stand or walk for 30 minutes at a time and 2 to 4 hours in an 8-hour workday, occasionally reach, push, pull, occasionally use foot controls, and never climb, balance, stoop, kneel, crouch, or crawl. (Tr. 354-70).

### III. The ALJ's Decision

In the decision issued on September 7, 2011, the ALJ made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2014.

2. Plaintiff has not engaged in substantial gainful activity since February 15, 2010, the alleged onset date.

3. Plaintiff has the following severe impairments: lumbar and cervical degenerative disc disease.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform sedentary work, except he can only occasionally climb and stoop. He may frequently balance, kneel, crouch, and crawl.

6. Plaintiff is unable to perform any past relevant work.

7. Plaintiff was born on February 28, 1966 and was 43 years old on the alleged disability onset date.

8. Plaintiff has at least a high school education, and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework

    supports a    finding that the plaintiff is not disabled, whether or not the plaintiff has    transferable job skills.

10. Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform.

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from February 15, 2010, through the date of the decision.

(Tr. 11-20).

### IV. Legal Standards

The district court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in

the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted).

"Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ failed to articulate a sufficient rationale to support his finding that the plaintiff did not have an impairment or combination of impairments

that meets or medically equals the severity of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.04. Plaintiff also argues that the ALJ's RFC determination is not supported by the medical evidence, and that the hypothetical question the ALJ posed to the vocational expert based on that RFC was flawed. The Court will address each of plaintiff's arguments in turn.

### A. Listing 1.04

To meet the listed impairment of "disorders of the spine," a claimant not only must have a disorder resulting in the compromise of a nerve root or the spinal cord, but also must meet the specific symptoms and documentation requirements under 20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.04 (A), (B), or (C). In this case, the ALJ found the plaintiff had a disorder of the spine but that "the medical evidence does not demonstrate any of the additional requirements on top of the claimant's degenerative disc disease." (Tr. 13). As the ALJ explained, the additional requirements are:

> (A) Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
> (B) Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
> (C) Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively...

20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.04. The ALJ observed that plaintiff had positive straight-leg raising tests, but not in both sitting and supine positions, that plaintiff has no muscle atrophy, and that plaintiff ambulates without assistance. (Tr. 13).

Plaintiff argues that, despite the absence of documentation of certain symptoms, his condition medically equals the listed requirement, and the ALJ's decision did not adequately explain or support a finding to the contrary. Under 20 C.F.R. 404.1526(a), an impairment is medically equivalent to a listed impairment if "it is at least equal in severity and duration to the criteria of any listed impairment." The ALJ stated that, "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment." (Tr. 12). The fact that the ALJ did not elaborate on this conclusion is not a reversible error, as long as the conclusion is supported by the record. Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011) ("There is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record.").

The ALJ's conclusion that plaintiff's impairment does not meet or medically equal the requirements of §1.04 is supported by the record. The record does not demonstrate the degree of impairment and restriction that would approach that contemplated by the listing. Medical evidence shows symmetrical muscle strength, tone, bulk, reflexes and sensation, general intact strength and sensation, normal coordination, normal reflexes, normal range of motion, and antalgic but otherwise normal gait. (Tr. 243; 274; 338). The record also shows that plaintiff's pain was successfully moderated by certain medications prescribed by Dr. Stynowick, plaintiff's pain management physician. (Tr. 314; 312). Plaintiff's daily activities also support the ALJ's conclusion that plaintiff's impairment does not medically equal the severity of impairment contemplated by the listing: *i.e.*, plaintiff can drive a car, mow the lawn on riding lawn mower, and occasionally shop or prepare meals. Plaintiff also testified that

he could walk for one to two hours, stand for 40 minutes, and sit for an hour. (Tr. 44-45). All of this evidence supports the the ALJ's conclusion that plaintiff did not meet or medically equal the criteria of listing 1.04, and the ALJ's failure to discuss his reasoning in detail is not a reversible error.

### B. Residual Functional Capacity

The ALJ determined that plaintiff has the RFC to perform "sedentary work . . . with the following exceptions: he may only occasionally climb and stoop. He may frequently balance, kneel, crouch, and crawl." (Tr. 13). Plaintiff argues that the RFC is not supported by "some" medical evidence, and the evidence that the ALJ used in arriving at the RFC is inconsistent with the ALJ's conclusion. After reviewing the ALJ's decision, the record, and the regulations and agency rulings defining "sedentary work," the Court agrees that the case must be remanded for reconsideration.

A sedentary job "is defined as one which involves sitting...." 20 C.F.R. §404.1567(a). Specifically, sedentary work requires approximately 6 hours of sitting, and no more than 2 hours of standing or walking in an 8-hour workday. SSR 96-9P, 1996 WL 374185, at *6. Sedentary work also "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 CFR §404.1567(a). The Social Security Administration has made clear that, "[i]n order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals. If an individual is unable to sit for a total of 6 hours in an 8-hour work day, the unskilled sedentary occupational base will be eroded." SSR 96-9P at *6. Furthermore, if an individual needs to alternate between sitting, standing, and walking, "where this need cannot be accommodated by scheduled breaks and a lunch period,

the occupational base for a full range of unskilled sedentary work will be eroded….The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing." Id. at *7.

In arriving at the conclusion that plaintiff has the RFC to perform sedentary work, the ALJ relied upon multiple sources. The opinions of treating and examining medical professionals were given "considerable weight," and no treating source had stated that plaintiff was disabled. The ALJ relied on plaintiff's testimony about his limitations The ALJ found this testimony "largely credible and consistent with the sedentary level of exertion," although he felt that plaintiff "likely understated" his capacity to sit, stand, and walk. The ALJ suggested plaintiff's credibility was undermined by the fact that he continues to drive, mow the lawn, and prepare meals, and also by medical evidence showing that plaintiff has been able control his pain through medication for periods of time. Finally, the ALJ summarized Dr. Henry's opinion, which he gave "significant weight," and found to be consistent with the RFC of sedentary work.

None of the sources on which the ALJ relied suggest that plaintiff is able to sit for 6 out of 8 hours. The only evidence that plaintiff has the ability to sit for 6 hours is the opinion of the non-examining physician, Dr. Ditmore. This opinion was referenced only in passing by the ALJ, and not relied upon. Indeed, Dr. Ditmore's opinion alone would be insufficient to support the RFC; "[t]he opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)).

The sources which the ALJ specifically identifies as being consistent with the RFC of sedentary work are not. Dr. Henry, who examined the plaintiff and whose opinion

was supposedly accorded "significant weight," concluded that plaintiff could sit for one hour at a time, not to exceed 4 hours per day, stand and walk for 30 minute intervals for 2 to 4 hours per day, lift 10 pounds, and should never climb, balance, stoop, kneel, crouch, or crawl.  Although Dr. Henry advised plaintiff could sit for no more than 4 hours, and would have to do so in one hour intervals, the ALJ did not include these limitations in his RFC.  He believed that the intervals mentioned by Dr. Henry "would be accommodated by the range of sedentary exertion, in combination with normal breaks in an eight-hour workday."  In addition, plaintiff's testimony that out of an 8 hour day, he can walk 1-2 hours, stand approximately 1 hour, sit 1 to 1.5 hours, was deemed understated but nonetheless "consistent with the sedentary level of exertion."

The fact that the ALJ explained that Dr. Henry's findings were consistent with the RFC, and plaintiff's testimony consistent with sedentary exertion, suggests a misunderstanding of what is required by sedentary work under the regulations.  The RFC is not supported by the evidence upon which it is purportedly based, nor is it supported by the record as a whole.

### C. Hypothetical Question Posed to Vocational Expert

In the event that, on remand, the plaintiff is found to have a more limited RFC, a new hypothetical should be posed to the vocational expert.  "A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant."  Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir. 1996) (citing Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994)).  A precise description in plaintiff's case would likely include the specific intervals at which plaintiff would have to sit, stand, or walk throughout the day to avoid debilitating pain.

### VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 29th day of January, 2013.